IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| RALPH OLMEDO, | ) | No. C 08-4467 CRB (PR) |
| | ) | |
| Petitioner, | ) | ORDER  DENYING |
| | ) | PETITION FOR A WRIT OF |
| vs. | ) | HABEAS CORPUS; DENYING |
| | ) | CERTIFICATE OF |
| DERRAL G. ADAMS, Warden, | ) | APPEALABILITY |
| | ) | |
| Respondent. | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |

Petitioner, a state prisoner at Corcoran State Prison in Corcoran, California, seeks a writ of habeas corpus under 28 U.S.C. § 2254 challenging a conviction from Alameda County Superior Court.  For the reasons set forth below, the Petition for Writ of Habeas Corpus will be denied.

## PROCEDURAL BACKGROUND

On November 10, 2005, a jury convicted Petitioner of two counts of continuous sexual abuse of a child.  Cal. Penal Code § 288.5.  On December 16, 2005, the trial court sentenced Petitioner to sixteen years in state prison.

On September 13, 2007, the California Court of Appeal affirmed the judgment of the trial court and denied Petitioner habeas relief in a consolidated opinion.  People v. Olmedo, Nos. A112664 & A115376, 2007 WL 2677134 (Cal.

Ct. App. Sept. 13, 2007); see Doc. #10, Ex. 12 at 1–43.  On December 12, 2007, the Supreme Court of California denied review.  Doc. #10, Ex. 14.

On September 24, 2008, Petitioner filed the instant Petition for a Writ of Habeas Corpus.  Doc. #1.  The Court found that, when liberally construed, the Petition appeared to state cognizable claims under 28 U.S.C. § 2254 and ordered Respondent to show cause why a writ of habeas corpus should not be granted. Doc. #2.  Respondent has filed an Answer, Doc. #9; Petitioner failed to file a Traverse.

## FACTUAL BACKGROUND

The California Court of Appeal summarized the facts of the case as follows:

### Prosecution Case

> J.D., who was 10 years old at the time of trial, testified that she lived with her mother and siblings, as well as sometimes with her grandmother Carmen. She and her younger sister R. would sometimes go with Carmen and her husband to the house of J.'s Uncle Ralphie (her great uncle by marriage), identified by her at trial as [Petitioner], and his wife Esperanza.  They sometimes went on weekdays and sometimes on weekends.  The children played or watched television there.

> [Petitioner] sometimes touched her when she was at his house; it happened sometimes in the garage and sometimes in the second bedroom.  Once when J. was sitting by herself in a rolling chair in the garage watching television, [Petitioner] came in and sat in another rolling chair.  He pulled her chair toward him and he put his fingers under her clothes and touched the outside of her vagina "for a little bit."  [Petitioner] did not say anything and J. did not say anything because she was scared.

> [Petitioner] touched J. in the garage other times as well.  He also touched her in the second bedroom.  Once, when she was sitting on the bed watching television, [Petitioner] came in and sat down on the bed next to her.  He then touched her vagina area ("where I go pee") with his fingers, under

2

her clothes.  That was not the only time he touched her vagina in the second bedroom.  [Petitioner] also sometimes touched J.'s breasts with his fingers, under her clothes.  When he touched her vagina, he would move his fingers.[1]  She could not remember other specific times when he touched her in the bedroom or garage.  [Petitioner] never said anything while he was touching J.  J. never told her mother or grandmother about what [Petitioner] did because she was scared; she thought she would get in trouble.  It was J.'s sister, R., who eventually said something to their mother.[2]

R.D., who was eight years old at the time of trial, testified that she used to visit her Uncle Ralphie's[3] house with her Grandma Carmen almost every weekend.  [Petitioner] touched her "chi-chis," her "colita," and her "butt" during visits.  He did this at times in the garage, the second bedroom, and the living room.

When she was in the garage, she would watch television or sweep sawdust off the floor.  Once, when she was in the garage sweeping, [Petitioner] came in and hugged her from behind and quickly touched her vagina ("colita") with his hands, outside her clothes.  That was not the only time he touched her vagina in the garage.  Once when R. was alone in the second bedroom watching a movie and she got up to change the channel, [Petitioner] came in and hugged her from the front, touching her quickly on the butt with his hands, over her clothes.  Another time, when R. was watching a movie in the living room, [Petitioner] came in and hugged her from the back.  He touched her breasts ("chi-chis").

---

[1] "On cross-examination, J. first said [Petitioner] had never put his fingers 'where you go pee.'  She did not recall telling a police officer that he had slid four fingers inside of her, then taken them out and rubbed her breasts.  She testified, however, that that was what happened."

[2] "On cross-examination, [J] said she did not know that [Petitioner] was touching R. until R. told their mother.  She did not recall telling the police officer that R. had told her that [Petitioner] was touching her too, but that they kept it to themselves because they were scared."

[3] "R. identified [Petitioner] as Uncle Ralphie during trial."

3

[Petitioner] never said anything when he touched R.  He touched her every time she was at his house.  R. did not tell her mother or grandmother about the touching when it first started happening because she was scared.

On cross-examination, R. testified that she first told her mother about [Petitioner] and his touching when she, her mother, and J. were at home watching television and a commercial about belly dancers came on.  Her mother said, "I do not like that," and R. said, "Like Tio Ralphie," and her mother said, "What?"  R. then told her mother where [Petitioner] had touched her, saying, "on our chi-chis, on our colita and on our butt."[4]  J. was sitting next to their mother at the time R. spoke.  R. believed the touching started when she was five years old. [Petitioner] touched her more than 30 times altogether, always over her clothing and always while giving her a hug.

Bertha Nevarez testified that she worked at the Calico Center, "a child abuse listening coordination center" in San Leandro.  Prior to July 2004, she had interviewed over a thousand children who had allegedly been victims of physical or sexual abuse.  She also had received ongoing training in child forensic interviewing, including suggestibility.  On July 13, 2004, she interviewed J. at the Calico Center; the interview was videotaped and transcribed.  J. told Nevarez that [Petitioner] touched her breasts, her "butt," and her "behind-butt."  On a drawing of a girl, J. circled the girl's vagina in describing her "butt,"[5] and the girl's buttocks in describing her "behind-butt."  J. said that [Petitioner] put his "fingers inside" her "butt," i.e., her vagina, although Nevarez acknowledged that J.'s words were ambiguous as to exactly what she meant by that.

Amparo Ozuna testified that she had been a forensic child interviewer at the Calico Center for three years and had interviewed well over 300 children prior to July 2004.  She had received ongoing training in child forensic interviewing.  She also had received various trainings on avoiding

---

[4]  "R. did not know at that time that [Petitioner] had also been touching J.; when she said 'our' in describing where [Petitioner] had touched her, that was a mistake."

4

suggestibility while interviewing children.[5]  On July 13, 2004, she interviewed R. at the Calico Center; the interview was videotaped.  On a drawing of a girl, R. circled the girl's breasts, which she called "chi-chis"; she circled the girl's vagina, which she called her "colita"; and she circled the girl's buttocks, which she called her "butt."  R. told Ozuna that [Petitioner] had touched her "chi-chis, colita, and butt."  On cross-examination, Ozuna testified that R. had said that J. told her that [Petitioner] had touched her too, and they had an agreement to keep it a secret.  R. also said that her mother had told her that Uncle Ralphie was sick in the brain.

Carmen D., who was 45 years old at the time of trial, testified that she had two children, Alberto and Maria Christina ("Maria").[6]  Carmen came to Oakland from Mexico when she was six years old, along with her brother, Ruben, and her sister, Esperanza, who is 16 years older than Carmen.  Her father and another brother, Juan, were already in Oakland.  [Petitioner's] family had helped Carmen's father when he first came to the United States.  Two or three months after Carmen arrived in Oakland, Esperanza married [Petitioner], who is some 30 years older than Carmen.

When Carmen was eight or nine years old, [Petitioner] began touching her.  She occasionally spent the night at [Petitioner] and Esperanza's house, and slept in the second bedroom.  [Petitioner] would get up early in the morning and bring coffee to Esperanza, and then he would come into the room in which Carmen was sleeping.  He started out by patting her leg to wake her up and it slowly progressed to where he started touching her butt, and then tried to kiss her on the lips.  He then started touching her breasts and vagina over her underwear.  He later started touching her under her clothes, including sticking his hands inside her underwear and touching her vagina.  He also put his finger in her vagina.  This touching happened while Carmen was

---

[5]  "On cross-examination, Ozuna acknowledged that she did not have any formal education in the area of child psychology, child development, or social welfare.  She did have an 'AA' degree in social science."

[6]  "Although Carmen's daughter is called 'Christina' by many family members, in this opinion, she will be referred to as 'Maria,' in conformity with the trial court record."

between the ages of eight and 14.  On several occasions when she was watching television in the living room and the adults were gathered in the kitchen, [Petitioner] would come into the living room, sit next to her, and touch her.  One time, when she was about 12 years old, [Petitioner] came into the living room, forced his knee between her legs, and kissed her.  [Petitioner] never said anything when he touched her.

At the age of eight or nine, Carmen told her mother that [Petitioner] was touching her.  Her mother did not want Carmen to tell Esperanza because she did not want [Petitioner] to stop her (Carmen and Esperanza's mother) from visiting Esperanza.  Her mother never called the police and Carmen never told Esperanza about the touching because "I loved my sister, because I didn't want to hurt her, because I didn't want my family to be pulled away."  After the touching stopped, when Carmen was about 14 years old, she put the touching "in the back and just moved on and tried to see [Petitioner] as my sister's husband, as the man that I learned to care about as a father."

After she had her children, Carmen continued to see Esperanza and [Petitioner].  She did not think about whether [Petitioner] might touch someone else because she wanted to be around her sister; she also did not believe he would do that to her daughter.  Starting when her daughter Maria was about six years old and her son Alberto was about eight years old, her children would sometimes spend the night at the home of [Petitioner], who also had two children.  Carmen's children were close to their cousins; the cousins were her children's godparents.

Starting at age six, Maria would spend the night at [Petitioner's] house once or twice a month.  When Maria was eight years old, Carmen found out that [Petitioner] was touching her.  Carmen's sister-in-law, Gloria, told her and Maria said it was true.  Carmen did not do anything about it because she did not want to be away from her family; she did not want to hurt her sister, who was like a second mother to her; and she did not want her mother not to be able to visit her daughter, Esperanza.[7]

---

[7] "Carmen testified on cross-examination that her mother said that if she 'spoke up, it would kill my sister because of her health and that all we had to do

When Maria was near her 14th birthday, someone called from Maria's school and asked Carmen to come to the school. Carmen spoke to officers from the Oakland Police Department, who asked whether she knew her daughter was being molested by [Petitioner]. She said she knew, and also said she had been molested by [Petitioner] as well. Carmen asked Maria not to press charges because "I figured if I could forget about it, if I was strong enough to forget about it, she would be able to do the same thing and put it behind her, and we would keep the family together." Carmen and her daughter did not have a relationship after that. However, Carmen was always very close to her two granddaughters, J. and R.

When Carmen and her husband moved to 60th Avenue in Oakland in 2003, J. and R. were living with them part of the time and with their mother, Maria, part of the time. Although she and Maria were not talking to each other, Maria would drop the girls off at her house. The new house was two and one-half blocks from [Petitioner's] home. Carmen visited her sister, Esperanza, almost every weekend between October 2003 and June 2004, and would always bring J. and R. with her.

Carmen never thought that [Petitioner] might touch her granddaughters because he was recuperating from bypass surgery and she thought that, because he had been close to death, he would try to improve the way he had been. Carmen never told her daughter that she was taking the girls to [Petitioner's] house because she and Maria did not have good communication and because when she had the girls with her, she was responsible for them.

[Petitioner] was at home when Carmen brought the girls there. She would watch movies, talk with her sister, and just be there when she visited, mainly staying in the living room and kitchen. Her granddaughters would sometimes be in the yard, sometimes in the garage, but mostly in the second bedroom because they watched cartoons there. [Petitioner's] grandchildren would often be there too,

was to keep a better watch on the kids when we went over there and just to make sure that [Petitioner] wasn't around them.' She acknowledged that she ignored the advice to keep Maria away from [Petitioner]."

7

and there were a lot of kids going in and out, never staying in one place.

On June 18, 2004, Carmen's son, Alberto, brought J. and R. to Carmen's house. Alberto told her to talk to the girls. She first called J. into her bedroom and said Alberto said she had something to say. J. just started crying, and Alberto finally said, "Ralph happened. That's what happened." Carmen hugged J. R. came in and the girls told her what had happened with [Petitioner]. Carmen was afraid to tell Maria because they were not on good terms and Carmen did not want to get into a confrontation with her. Alberto convinced Carmen to talk to Maria, and Carmen told her she was sorry and said, "[W]hatever you decide to do, I'm with you. If you want to speak up, I'm with you." She wanted to let her daughter know that, as much as she loved her family or thought she was protecting her family, she had put her granddaughters at risk by trying to pretend this would not happen.

That evening, Carmen went to [Petitioner's] house, where she had a conversation with him. She was not satisfied with the conversation. The next day, Saturday, Carmen talked to Maria, who said she was definitely going to call the police; she was not going to let [Petitioner] get away with it again. The following day, Sunday, [Petitioner's] son called early in the morning and said [Petitioner] wanted Carmen to come over and talk to him. She went to [Petitioner's] house. He was alone in the living room. [Petitioner] said he did not think he was doing anything wrong, asked if there was any way to take care of this without getting anyone else involved, and asked if $5,000 would help. He offered the money "to make it better." She said, "how dare he tries [sic] to buy my girls. My girls were not for sale. Their future is not for sale."

Carmen and Maria agreed that Carmen would call the police since the girls had been under her care and were her responsibility, and she did so. The police came to her home on June 23 and took J. and R. outside to their patrol cars to take statements from them.

Maria Christina D., who was 26 years old at the time of trial, testified that she has five children; the two oldest are J. and R. When she was very young, Maria was close to her Aunt Esperanza and her Uncle Ralph, [Petitioner]. Growing up, she was

8

close to her cousins, Robert and Sylvia, who are [Petitioner's] children.

When Maria was five or six years old, [Petitioner] began touching her inappropriately in the living room at his house. She stayed overnight at his house regularly and would sleep on the living room couch. She remembered waking up to him touching her very early in the morning before anyone woke up. At first he touched her over her clothes, and later he started touching her breasts and vagina under her clothes. The worst was when he put his fingers inside her vagina. The touchings went on for a total of nine or ten years and "happened so many so many times, I can't keep count." [Petitioner] never said anything when he touched her.

In 1993, Maria first told relatives at a family party, including [Petitioner's] children, that [Petitioner] had been molesting her. The family did nothing about it. That same year, when she was in junior high school, she told a school psychologist about the molestation. The school called the police. A police officer came and took a statement from Maria, which she signed. She was asked if she wanted to press charges and she said no, because she did not want to split up the family. After that, she only occasionally saw [Petitioner] at family parties. She forgave him.

Maria's daughters, J. and R., were very close to their grandmother, Carmen, and would sometimes spend the night at her house on weekends. Between October 2003 and June 2004, Maria was not talking to her mother. Maria did not know her daughters were regularly going over to her Aunt Esperanza's house on weekends.

On June 18, 2004,[8] Maria was at home with her daughters when R. blurted out that "Uncle Ralphie touches us here, here and here," while pointing to her chest, vaginal area, and behind area. Maria responded, "No, no. Don't tell me that," and J. said, "You see, [R.D.]. You weren't supposed to say nothing. It was a secret." J. was mad and would not

---

[8] "Maria was pregnant at the time and gave birth four days later, on June 22."

9

talk about it.[9]  Maria's brother came in and, after she told him what had happened, he asked her what she wanted to do.  She said she was going to call the police.  "I knew when they first told me.  I knew that I was going to put an end to this."  Her brother then took the girls to her mom's house.  Maria called the police that same day, though officers did not come to take a report until later.

Alberto Moran, Carmen's son and Maria's brother, testified that, before June 2004, he was close to [Petitioner's] family.  After June, he, his mother, and his sister were not close to [Petitioner's] family.  In June 2004, he lived in an apartment in the same building as his sister, Maria.  On June 18, 2004, Maria called Alberto into her apartment; she was crying.  She asked J. and R. to tell him what happened.  J. did not want to talk, but R. said that her Uncle Ralph had touched her and pointed to her breasts and her vagina.  Alberto and his sister talked about what to do and, at some point, it was decided that he would take the girls to his mother's house to tell her, which he did.  While they were there, Carmen called J. into her room and asked her what had happened.  J. started crying, but did not say anything.  When R. came in, she told Carmen what she had told Alberto earlier.

Alberto and his mother, Carmen, went to [Petitioner's] house later that day.  Carmen and [Petitioner] went into the garage and Alberto waited in the living room with [Petitioner's] son, Robert.  Alberto told Robert what the girls had said.  Robert just shook his head and put his hand over his head.  Alberto and his mother eventually left.

**Defense Case**

Oakland Police Officer Kevin McDonald testified that he interviewed J. in his patrol car on June 23, 2004.  He took her statement, at which time she reported that, inter alia, after "sliding his four fingers inside me," [Petitioner] would "take them out and rub my breast more."  J. also said she and R. had

---

[9]  "On cross-examination, Maria testified that just before R. told her about the touchings, a commercial was on television and Maria told them she did not want them to sleep in their underwear and was trying to explain to them that men 'have bad thoughts.'  At that point, R. said, 'Oh, like Tio Ralphie when he touches me here, here and here?'"

told their mother about [Petitioner's] conduct "[a] few months ago." On cross-examination, Officer McDonald acknowledged that he had received no special training on interviewing child witnesses. He also acknowledged that J. talked about [Petitioner] putting his fingers inside her underwear.

Susana Reyes-Oregon testified that she had lived next door to [Petitioner] and his family for 17 years, since she was 12 or 13 years old. Between ages 12 and 15, she was regularly at [Petitioner's] house and was occasionally alone with him. He never touched her inappropriately, nor had she ever seen him touch any other girls inappropriately. She had never known [Petitioner] to be dishonest and she had allowed her six-year-old daughter and four-year-old son to be in his presence.

Martha Estella Zamarripa, Susana Reyes-Oregon's sister, testified that she had lived next door to [Petitioner's] family since she was five years old. Zamarripa was at [Petitioner's] house two to three times a week between the ages of five and 12. [Petitioner], with whom she was never alone, never touched her in a way that made her uncomfortable. She never saw him touch other young girls in a way that was inappropriate. He was always a nice neighbor and she never knew him to be untruthful.

Karina Sanchez, who was 21 years old at the time of trial, testified that Esperanza is her aunt. She had known [Petitioner] all her life and had been alone with him on several occasions between the ages of eight and 15. He never touched her in a way that made her uncomfortable and she never saw him touch any other girls in an inappropriate way. She testified that [Petitioner's] reputation for honesty and truthfulness is that he is a good and honest man. Sanchez testified that Carmen's reputation is that she is flaky. Maria's reputation is that she lies.

Sylvia Frates, [Petitioner's] daughter, who was 37 years old at the time of trial, testified that she is married and has two children, a girl who is seven years old and a boy who is four years old. There is a big age difference between her and Maria and they were not close growing up. Sylvia and her brother, Robert, were godparents to Maria and her brother Alberto. She never heard allegations that her father had touched Maria inappropriately before the present case arose. Growing up, none of her friends ever said [Petitioner] made them uncomfortable or had touched

11

them inappropriately.  She never saw him act in an inappropriate way toward any of her girlfriends. Sylvia saw Carmen at [Petitioner's] house every weekend between October 2003 and June 2004, but Sylvia only remembered J. and R. being there two or three times.

Roberto Olmedo, [Petitioner's] son, who was 37 years old at the time of trial, testified that he had three children, two girls, ages seven and two, and one boy, age 10.  Between October 2003 and June 2004, Roberto was renting a house next door to his parents and was at their house frequently.  During his teen years, he was close to his cousins Maria and Alberto and hung out with them on a weekly basis at their grandmother's house; he did not recall them ever spending the night at his parents' house.

Roberto recalled Maria accusing [Petitioner] of molesting her in 1993, but he did not give it any value.  She was intoxicated at the time.  Roberto's children were at [Petitioner's] house often and [Petitioner] never acted inappropriately with them. He learned about the allegations against [Petitioner] regarding J. and R. after Carmen came over to talk to [Petitioner]; she looked like something was bothering her and, after she left, [Petitioner] told him what she was bothered about.  Later, at [Petitioner's] request, Roberto called Carmen and asked her to come over. That conversation got pretty loud, with Carmen being the loudest.

Robert Frates, [Petitioner's] son-in-law and Sylvia Frates's husband, testified that he had known [Petitioner] for 10 years.  Between October 2003 and June 2004, he was at [Petitioner's] house almost daily.  He never saw [Petitioner] touch a child in an inappropriate way and he had no concerns about leaving his children with [Petitioner].  Carmen was at [Petitioner's] house often, and she frequently had J. and R. with her.  He saw them there on a weekly basis, on average.  He never saw either girl alone with [Petitioner].  It was a small house and there were always a lot of people there.  It is difficult for anybody to be alone in [Petitioner's] house.

Esperanza Olmedo, who was 62 years old at the time of trial, testified that she had been married to [Petitioner] for 40 years and had also moved into their home on 62nd Street in Oakland 40 years ago. When Esperanza's younger sister Carmen (who she called Carmelita) was between the ages of five and

14, she never spent the night at Esperanza and [Petitioner's] house. Carmen only came to the house with their mother and father, and Esperanza was not aware of Carmen ever being alone with [Petitioner] because there were always so many people in the house. Carmen never said anything to Esperanza about [Petitioner] touching her in an inappropriate manner. She and Carmen were not close after Esperanza married [Petitioner] because Carmen got married at a very young age.

As far as Esperanza could recall, her niece, Maria, never spent the night at her and [Petitioner's] house when Maria was between the ages of five and 15. She never felt particularly close to Maria.

From 2003 through June 2004, there were always lots of children at Esperanza's home. Three of her grandchildren lived with her and the neighbors' children came over too. During that time, she did not recall seeing children alone in the house. She never saw her grandnieces, J. and R., alone in any room with [Petitioner] during that time either; there were always other kids with them. Also, the children supposed to keep the door open in the rooms they were in. There was no door between the kitchen and living room, and it was possible to see inside the second bedroom from one of the chairs at the kitchen table. The house had a garage in the backyard and there also was a big, vicious dog in the backyard. The children were not allowed to go in the backyard without a grownup or unless the dog was tied up or put in its dog run. They were not allowed in the garage without adult supervision.

In the year before June 2004, when Carmen's husband was painting Esperanza and [Petitioner's] house, Carmen came over three or four days a week and also on the weekends to watch movies. Carmen brought J. and R. to the house only two or three times on the weekends. The girls would play outside with the other children or watch cartoons with the older kids in the second bedroom or the living room. Between October 2003 and June 2004, Esperanza never saw J. or R. acting unusually or trying to stay away from [Petitioner].

[Petitioner] testified that he was born in 1929 in Oakland. After he and Esperanza married in 1966, Carmen would come to their house to visit with her family, never alone. She never spent the night at his house. When she was a girl, he never approached her

13

while she was sleeping and touched her and never touched her in the living room of his house.  He never heard of Carmen alleging that he had touched her inappropriately before this case started.  He often was the earliest one up in the morning at his house and, while everyone else was sleeping, would get up and make coffee.  He would then bring coffee to Esperanza to wake her up.

[Petitioner] saw Maria, Esperanza's niece, at family get-togethers when she was a child.  He did not recall her spending the night at his house.  He never placed his hand under her clothes and rubbed her breasts or vaginal area.  He learned that she had made allegations about his touching her in about 1993.  The police never came to talk to him about the allegations.

Maria's daughters, J. and R., would come over to his house at times with Carmen between January 2003 and June 2004.  He never touched J. on her breasts, vaginal area, or butt, over or under her clothes.  He first learned of these allegations when Carmen came to his house on June 18, 2004.  He was surprised by the allegations and told her they were not true.  A few days later, [Petitioner] had his son, Robert, call Carmen and ask her to come over.  She came over with her son, Alberto.  [Petitioner] offered her money because she was having financial problems and he thought she needed money and was scheming.  So he told her he had just requested $5,000 from his 401-k plan.  He said:  "We can take care of the situation.  Otherwise, this can go into a very messy, expensive situation."  Carmen did not want his money.

[Petitioner] never touched R. in a sexual way. He never touched either J. or R. in a way intended to arouse himself or anybody else.  Nor was there any truth to the claims of Maria or Carmen that he touched them inappropriately.

Doc. #10, Ex. 12 at 2–15.

//

//

//

**LEGAL STANDARD**

14

1          Under the Antiterrorism and Effective Death Penalty Act of 1996

2    ("AEDPA"), codified under 28 U.S.C. § 2254, this Court may entertain a petition

3    for habeas relief on behalf of a California state prisoner "only on the ground that

4    he is in custody in violation of the Constitution or laws or treaties of the United

5    States." 28 U.S.C. § 2254(a). The writ may not be granted unless the state

6    court's adjudication of any claim on the merits: "(1) resulted in a decision that

7    was contrary to, or involved an unreasonable application of, clearly established

8    Federal law, as determined by the Supreme Court of the United States; or (2)

9    resulted in a decision that was based on an unreasonable determination of the

10   facts in light of the evidence presented in the State court proceeding." 28 U.S.C.

11   § 2254(d). Under this deferential standard, federal habeas relief will not be

12   granted "simply because [this] [C]ourt concludes in its independent judgment that

13   the relevant state court decision applied clearly established federal law

14   erroneously or incorrectly. Rather, that application must also be unreasonable."

15   Williams v. Taylor, 529 U.S. 362, 411 (2000).

16          While circuit law may provide persuasive authority in determining

17   whether the state court made an unreasonable application of Supreme Court

18   precedent, the only definitive source of clearly established federal law under 28

19   U.S.C. § 2254(d) rests in the holdings (as opposed to the dicta) of the Supreme

20   Court as of the time of the state court decision. Williams, 529 U.S. at 412; Clark

21   v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003).

22          The state court decision to which 28 U.S.C. § 2254 applies is the "last

23   reasoned decision" of the state court. See Ylst v. Nunnemaker, 501 U.S. 797,

24   803–04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091–92 (9th Cir. 2005). The

25   last reasoned decision constitutes an "adjudication on the merits" for purposes of

26   28 U.S.C. § 2254(d) if the court resolved the rights of the parties based on the

27

28                                          15

substance of the claim, rather than on the basis of a procedural or other rule that precluded the state court from reviewing the merits.  <u>Barker</u>, 423 F.3d  at 1092.

## CLAIMS & ANALYSIS

Petitioner states he is entitled to relief under 28 U.S.C. § 2254 by raising the following claims:  (1) the trial court erred in admitting evidence of Petitioner's prior uncharged sexual offenses in violation of his right to due process; (2) the trial court erred in refusing to allow a defense expert to testify in violation of Petitioner's right to present a defense; (3) the trial court erred in refusing to allow trial counsel to question a witness about one of the victim's allegedly false molestation allegation against Petitioner in violation of his right to confrontation; (4) the prosecutor engaged in misconduct that violated Petitioner's constitutional rights; and (5) trial counsel provided ineffective assistance at various stages of Petitioner's trial.  Doc. #1 at 6 & 9.

Respondent denies that Petitioner suffered any deprivation of constitutional rights and claims that he has failed to show that the state appellate court decision adjudicating his claims was contrary to, or involved an unreasonable application, clearly established federal law, as determined by the United States Supreme Court, or was based on an unreasonable determination of the facts in light of the evidence presented in the trial court.  Doc. #9 at 2. Respondent further argues that Petitioner's claims of trial court error in refusing to allow trial counsel to question a witness regarding the victim's false molestation allegation and of prosecutorial misconduct are procedurally barred. Id.  Each claim is analyzed in turn below.

//

//

      1.    <u>Alleged Due Process Violation Resulting from Admission of Evidence of Prior Uncharged Sexual Offenses</u>

Petitioner claims the trial court violated his Fourteenth Amendment due process rights by admitting evidence of uncharged sexual conduct pursuant to California Evidence Code section 1108.[10]  Doc. #1 at 6.  Respondent argues that Petitioner is not entitled to federal habeas relief on this claim because there is no clearly established United States Supreme Court precedent that holds the admission of propensity evidence violates a petitioner's right to due process. Doc. #9-1 at 20.  The Court agrees.

//

//

The California Court of Appeal provided the following background

---

[10]  California Evidence Code, section 1108, subdivision (a) provides:  "[i]n a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352."

Evidence Code section 1101 provides:  "(a)  Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion. (b)  Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act.  (c)  Nothing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness."

Evidence Code section 352 provides:  "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

regarding this claim:

> [Petitioner] contends the trial court erred in admitting testimony, pursuant to Evidence Code sections 1101 and 1108,[] regarding prior sexual offenses committed by [Petitioner].
>
> A. Trial Court Background
>
> Before trial began, the prosecutor filed a motion seeking to admit evidence of [Petitioner's] prior uncharged sexual acts against Carmen and Maria, as propensity evidence pursuant to [Evidence Code] section 1108 and to prove [Petitioner's] intent, absence of mistake, or common scheme or plan pursuant to section 1101, subdivision (b).  Defense counsel filed an opposition to the motion, arguing that the evidence should be excluded pursuant to [Evidence Code] sections 352 and 1101, subdivision (a).
>
> At the conclusion of a hearing at which both counsel further argued the issues, the trial court found the prior sexual offense evidence admissible under both sections 1108 and 1101, subdivision (b), with the exception of evidence that [Petitioner] had forced both Carmen and Maria to touch his penis and evidence that he attempted to rape Carmen, which were [sic] excluded under section 352 as dissimilar from the charged offenses.  The court noted that its ruling was "based on the [Petitioner's] position of trust, familiarity with the parties, access to the parties and the similarities in and the actual touching.  All of those areas are areas of similarity."

Doc. #10, Ex. 12 at 15 (footnote omitted).

After providing this background, the California Court of Appeal upheld the trial court's decision to admit the prior sexual offense evidence as propensity evidence under Evidence Code section 1108.  Doc. #10, Ex. 12 at 16.  The court relied on <u>People v. Falsetta</u> (1999) 21 Cal.4th 903, 915, wherein the California Supreme Court "found that section 1108, which permits introduction of propensity evidence in cases alleging the commission of sexual offenses, [does] not violate a defendant's due process rights."  Id.

18

The United States Supreme Court has not found that the introduction of propensity evidence offends the Due Process Clause; indeed, the High Court has expressly left open that very question.  Estelle v. McGuire, 502 U.S. 62, 75 n. 5 (1991).  Because it is an open question, it is not clearly established federal law that the admission of propensity evidence – such as evidence that Petitioner committed prior sexual offenses similar to those he was accused of committing in the instant matter – violates due process.  Further, courts have "routinely allowed propensity evidence in sex-offense cases, even while disallowing it in other criminal prosecutions."  United States v. LeMay, 260 F.3d 1018, 1025–26 (9th Cir. 2001) (holding that Rule 414 of the Federal Rules of Evidence, which, like California Evidence Code section 1108, allows admission of evidence of prior sexual offenses to show a propensity to commit the charged offense, does not violate due process because the evidence is still subject to the trial court balancing the probative value of the evidence versus its prejudicial effect, thereby adequately safeguarding a defendant's right to a fair trial).

Because the Supreme Court has left open the question whether the admission of propensity evidence violates due process, Petitioner is not entitled to relief on his claim that the trial court's admission of evidence of uncharged sexual conduct under Evidence Code section 1108 was a violation of his right to due process.  See 28 U.S.C. § 2254(d); Williams, 529 U.S. at 412; Estelle, 502 U.S. at 75 n. 5; cf. Larson v. Palmateer, 515 F.3d 1057, 1066 (9th Cir. 2008) (because Supreme Court expressly reserved the question of whether using evidence of prior crimes to show propensity for criminal activity could ever violate due process, state court's rejection of claim was not unreasonable application of clearly established federal law).  Accordingly, Petitioner's claim on this particular ground is DENIED.

2.      Alleged Denial of Right to Present a Defense by Refusing Defense
        Expert Testimony

Petitioner claims the trial court violated his Sixth and Fourteenth
Amendment right to present a defense by refusing defense expert testimony on
the suggestibility of child witnesses and forensic interviewing techniques as they
apply to children.  Doc. #1 at 6.  Respondent argues that the California Court of
Appeal's finding that the trial court properly excluded the proffered defense
testimony on the grounds that it was irrelevant and created the potential to waste
time and confuse the jury was not contrary to, nor an unreasonable application of,
clearly established United States Supreme Court precedent.  Doc. #9-1 at 23–26.
The Court agrees.

The California Court of Appeal provided the following background
regarding this claim:

> [Petitioner] contends the trial court erred when
> it denied his request to introduce the testimony of Dr.
> Katherine Okla, who would have testified as an
> expert on the suggestibility of child witnesses and the
> forensic interviewing of children, thereby violating
> his constitutional right to present a defense.
>
> . . . .
>
> A.  Trial Court Background
>
> Over the prosecutor's objection, defense
> counsel sought to introduce Dr. Okla's testimony in
> the areas of suggestibility of child witnesses and
> forensic interview techniques.  During a discussion
> with the trial court and the prosecutor regarding the
> proposed expert testimony, the court asked defense
> counsel what Dr. Okla's findings were.  Counsel
> responded:  "She found that in her opinion, there
> were issues with, the technical phrase I believe she
> used was, report monitoring procedures with respect
> to how these children were dealt with.  She found that
> there were inconsistencies in the manner of J.'s
> reporting with that of the normal of [sic] other
> similarly situation children, based on the studies that
> have been done.  [¶]  And the one other area I don't

remember, because I just took real brief notes, I asked her to actually send me an email with an outline of her findings, which unfortunately, apparently her home was without power for a great deal of the weekend, and I never got it.  So I don't know the full extent of what her findings were, other than what I've just related to the Court."

The trial court held a[n Evidence Code] section 402 hearing to enable it to determine whether to permit Dr. Okla to testify as an expert witness at trial.  At the hearing, Dr. Okla testified extensively regarding her training and experience, including, inter alia, that she had a Ph.D. in clinical psychology from the University of Michigan; that she had qualified as an expert in the areas of forensic interview techniques, suggestibility, and patterns of child sexual abuse 40 to 50 times, primarily in Michigan, but also in Arizona, Iowa, and Ohio; and that she had interviewed thousands of children during her clinical career, with the bulk of her current work involving conducting forensic interviews of children or critiquing such interviews.

Dr. Okla testified that she had reviewed the videotaped interviews of J. and R. and the relevant police reports prior to the hearing.  She also testified generally about issues related to forensic interviewing and suggestibility in children.  However, when asked by both the prosecutor and the trial court whether she had made any findings or reached any conclusions in this case regarding suggestibility and the forensic interviewing techniques used, she responded that she had not.  She also had difficulty responding to the court's question whether her role in the case was as a consultant or an expert.

At the conclusion of the section 402 hearing, the trial court ruled as follows:  "I listened very carefully to the proposed expert, and when [sic] she had been posed any hypotheticals, whether she could actually render an expert opinion.  And it appears that the information she has shared with the Court thus far is that she would provide suggestions of what may have resulted, in her opinion, to be pertinent areas to control forensic interviews and areas of suggestibility.

"She's indicated that she has not rendered any opinion with regards to suggestibility in this case, that she's not rendered any opinion with regards to forensic technique.  I did not hear any discussion with

21

regard to any hypothetical that may have been posed to her, and it appears on the totality of the circumstances and the testimony on the 402 hearing, that her participation, thus far, has been more by way of a consultant than an expert on the ultimate issues of suggestibility and forensic technique when making an evaluation, because when posed with those questions, she indicated she had suggestions in areas which you should be sensitive to.

"So under [Evidence Code sections] 352, 801, 720,[11] my review of her testimony, it appears her testimony is not relevant to these proceedings and that she does not qualify as an expert in the areas of suggestibility as it relates to this matter."

Defense counsel then asked if the court was finding Dr. Okla not qualified, and the court responded: "There's no grounds for her to be called as an expert witness in this particular case under the circumstances, under [section] 720, given her testimony and sequence [sic]."

Doc. #10, Ex. 12 at 19–21; see Doc. #10, Ex. 2, Vol. 9 at 415 (reporter's

---

[11] Evidence Code section 720 provides: "(a) A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates.  Against the objection of a party, such special knowledge, skill, experience, training, or education must be shown before the witness may testify as an expert; (b) A witness' special knowledge, skill, experience, training, or education may be shown by any otherwise admissible evidence, including his own testimony."

Evidence Code section 801 provides: "If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is: (a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; and (b) Based on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion."

22

1    transcript of hearing).

2           After providing this background, the California Court of Appeal

3    concluded that "even assuming expert testimony regarding the suggestibility of

4    child witnesses and the forensic interviewing of children is otherwise admissible

5    in California, we conclude that the trial court did not abuse its discretion in

6    excluding Dr. Okla's testimony."  Doc. #10, Ex. 12 at 23.  The court explained:

7    "[t]his is because Dr. Okla did not demonstrate, at the section 402 hearing, how

8    her testimony would be germane to the specific facts admitted in evidence at

9    trial."  Id.  The court noted several instances in Okla's hearing testimony wherein

10   she failed to cite to particular problems with the child interviews conducted in

11   Petitioner's case, and instead gave "extremely vague and indefinite" answers and

12   "merely spoke generally and theoretically about problems in interviewing

13   children."  Id.  The court then concluded:

14          [W]hen asked repeatedly about her findings and
             conclusions with respect to the evidence in this case,
15          Dr. Okla testified that she had not reached any
             specific conclusions and merely spoke in generalities
16          that did not relate to the particular facts at issue here.
             Moreover, when directly asked whether her
17          involvement in the case was more as a consultant or
             expert witness, she did not state that she was an
18          expert, but instead spoke vaguely about her
             suggestions regarding "places [the defense] might
19          need to go" through either a lay or expert witness.

20                 In light of Dr. Okla's failure to explain the
             relevance of her general testimony on suggestibility
21          in children and forensic interviewing to the specific
             facts of this case or what her role would be, we find
22          that the trial court acted well within its discretion
             when it found that her testimony was not relevant to
23          the proceedings and that she did not qualify as an
             expert in the area of suggestibility "as it relates to this
24          matter."  [Citations.]

25   Doc. #10, Ex. 12 at 25.  In addition to finding that the trial court did not abuse its

26   discretion in excluding the evidence on relevancy grounds, the California Court

27

28                                           23

of Appeal found the trial court acted within its discretion by excluding the evidence under Evidence Code section 352 due to its potential to necessitate an undue consumption of time and confuse the issues. Id. at 27.

"State and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." Holmes v. South Carolina, 547 U.S. 319, 324 (2006) (quotations and citations omitted); see also Montana v. Egelhoff, 518 U.S. 37, 42 (1996) (holding that due process does not guarantee a defendant the right to present all relevant evidence). This latitude is limited, however, by a defendant's Sixth and Fourteenth Amendment rights to due process and to present a defense. See Holmes, 547 U.S. at 324. "While the Constitution prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury."[12] Id. at 325–26; see Egelhoff, 518 U.S. at 42 (holding that the exclusion of evidence does not violate the Due Process Clause unless "it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental"). The defendant, not the state, bears the burden to demonstrate that the principle violated by the evidentiary rule "is so rooted in the traditions and

_____

[12] The Ninth Circuit has created its own five-factor balancing test to decide if the exclusion of evidence violates due process or the right to present a defense. See Chia v. Cambra, 360 F.3d 997, 1004 (9th Cir. 2004) (citing Miller v. Stagner, 757 F.2d 988, 994 (9th Cir. 1985)); Drayden v. White, 232 F.3d 704, 711 (9th Cir. 2000) (same). But because the Miller balancing test is a creation of circuit law, it is not "clearly established law" for purposes of habeas corpus review under 28 U.S.C. § 2254(d)(1), see Moses v. Payne, 555 F.3d 742, 760 (9th Cir. 2009), and the Court therefore cannot apply it here.

conscience of our people as to be ranked as fundamental." <u>Egelhoff</u>, 518 U.S. at 47 (internal quotations and citations omitted).

Applying these legal principles to Dr. Okla's proffered testimony, the Court cannot say that the California Court of Appeal's conclusion upholding the trial court's exclusion of the evidence resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, or was based on an unreasonable determination of the facts in light of the evidence presented to the trial court.  <u>See</u> 28 U.S.C. § 2254(d); <u>Williams</u>, 529 U.S. at 412; <u>Holmes</u>, 547 U.S. at 325–26; <u>Egelhoff</u>, 518 U.S. at 42.  During voir dire, Dr. Okla testified to general principles regarding the suggestibility of child witnesses and forensic interviewing techniques, but could not, after repeated inquiries, link these general principles to the videotaped interviews of the child victims or the police reports she reviewed in Petitioner's case.  <u>See</u> Doc. #10, Ex. 2, Vol. 9 at 397–400, 404–05.  She did not even identify herself as a qualified "expert" on the subjects of her testimony; rather, when asked directly, she implied she was more of a "consultant."  Id. at 404–05.

Further, as Respondent notes, Doc. #9-1 at 25, the defense trial strategy was to deny that Petitioner committed any of the alleged molestations and to establish that the victims' accusations were false.  <u>See</u> Doc. #1-3 at 27–28; <u>see also</u> Doc. #10, Ex. 2, Vol. 8 at 321–24 &  326–28 (Petitioner's testimony denying allegations that he ever touched Carmen, Maria, J.D. or R.D. inappropriately); Doc. #10, Ex. 2, Vol. 8 at 263–65, 268, 270–72, 281–83, 294, 300–01; Doc. #10, Ex. 2, Vol. 9 at 370–72 & 378–80 (testimony of various defense witnesses that: (1) Petitioner never had touched them inappropriately when they were young; (2) they trusted Petitioner with their children; (3) they found Carmen and Maria to be dishonest; and (4) they rarely saw J.D. and R.D. at Petitioner's home, either by

themselves or with others present).  Given the defense strategy to deny all allegations, as well as the fact that the defense was able to cross-examine the victims' interviewer regarding the same topics about which Dr. Okla would have testified, see Doc. #10, Ex. 2, Vol. 7 at 128–30, the California Court of Appeal's conclusion that the trial court's exclusion of Dr. Okla's testimony did not violate Petitioner's due process rights was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of the facts in light of the evidence presented to the trial court.  See 28 U.S.C. § 2254(d); Williams, 529 U.S. at 412; Holmes, 547 U.S. at 325–26; Egelhoff, 518 U.S. at 42.  Accordingly, Petitioner's claim on this particular ground is DENIED.

3.    Alleged Denial of Right to Confrontation by Precluding Witness Testimony Regarding Victim's False Molestation Allegation

Petitioner claims the trial court violated his Sixth and Fourteenth Amendment right to confrontation when it refused to allow trial counsel to question defense witness Karina Sanchez about Carmen's false claim that Petitioner had molested Sanchez.  Doc. #1 at 6.  Respondent argues that the Court need not reach the merits of Petitioner's claim because, as the California Court of Appeal found, it was not preserved at trial due to trial counsel's failure to secure a ruling from the trial court regarding the issue.  Doc. #9-1 at 26–27; Doc. #10, Ex. 12 at 32–32.  The Court agrees.

The California Court of Appeal provided the following background regarding this claim:

A.  Trial Court Background

During a hearing before the trial court, the prosecutor objected to admission of proposed testimony from defense witness, Karina Sanchez, that Carmen had told her (Sanchez) that [Petitioner] had

molested Sanchez, and that Sanchez forcibly denied it.  The prosecutor objected on the grounds that the proposed testimony constituted late discovery, under Penal Code sections 1054.3 and 1054.7, and was inflammatory, under [Evidence Code] section 352.  In the alternative, the prosecutor asked that the court instruct the jury, pursuant to CALJIC No. 2.28, that defense counsel had belatedly disclosed Sanchez's statement.

Although the record is not absolutely clear, the court's comments indicate that it did not find preclusion of the testimony, pursuant to Penal Code section 1054.5, appropriate.  However, the court ordered the immediate disclosure of any written statements related to the proposed testimony and reserved judgment on whether to give CALJIC No. 2.28, pending a showing as to whether defense counsel delayed providing the statement to the prosecutor.

During Sanchez's testimony, defense counsel made no attempt to elicit any testimony from her on this point.  Thereafter, defense counsel provided the court with information regarding the timing of the defense's receipt of Sanchez's statement, after which the court stated that it was going to give CALJIC No. 2.28.  However, the court never made a definitive ruling excluding Sanchez's proposed testimony.[13]

Doc. #10, Ex. 12 at 31–32.  The California Court of Appeal then found that because trial counsel "failed to secure a definitive ruling on the admissibility of Karina Sanchez's proposed testimony regarding what Carmen had said to her, the issue was not preserved for appellate review."  Id. at 32.  The court also refused to exercise its discretion to review the issue, in part because it concluded that

_____

[13]  "At our request, both parties submitted supplemental briefing regarding whether the court did in fact make a ruling on this question.  Although [Petitioner] attempts to argue, as he did in his opening brief, that statements by the court to the prosecutor to the effect that the prosecutor's comments regarding the admissibility of the statement were 'argument' and 'theory' constituted a ruling on admissibility.  In context, it is quite clear that the court was merely responding to the prosecutor's comments, not ruling on the admissibility of the proposed testimony.  The prosecutor acknowledges, in its supplemental brief, that no ruling was made."

27

Sanchez's proposed testimony was not "of such critical importance as to implicate [Petitioner's] right to present a defense." Id. (citing Chambers v. Mississippi, 410 U.S. 284, 294 (1983) (exclusion of evidence vital to a petitioner's defense constitutes denial of a fair trial)).

A federal court will not review questions of federal law decided by a state court if the decision also rests on a state law ground that is independent of the federal question and adequate to support the judgment. Coleman v. Thompson, 501 U.S. 722, 729–30 (1991). In cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice. Id. at 750. A petitioner must establish factual innocence in order to show that a fundamental miscarriage of justice would result from application of procedural default. Gandarela v. Johnson, 275 F.3d 744, 749–50 (9th Cir. 2002).

Under California law, a defendant must secure a ruling from the trial court regarding the admission of evidence in order to preserve his claim for appellate review. See People v. Ramos, 15 Cal. 4th 1133, 1171 (1997). This is part of California's contemporaneous objection rule codified in Evidence Code section 353 and recognized by the Ninth Circuit in affirming the denial of a federal petition on grounds of procedural default. See, e.g., Davis v. Woodford, 384 F.3d 628, 653–54 (9th Cir. 2004) (finding Confrontation Clause claim procedurally barred where state supreme court found constitutional claim waived because petitioner failed to raise it below).

Here, because Petitioner failed to secure a ruling from the trial court on the

admissibility of Karina Sanchez's testimony, his claim is procedurally defaulted. See Ramos, 15 Cal. 4th at 1171; cf. Davis, 384 F.3d at 653–54.  Further, because Petitioner has not attempted to show cause and prejudice or that failure to consider his claim will result in a fundamental miscarriage of justice, this Court is barred from considering Petitioner's claim.  Coleman, 501 U.S. at 750.

         4.      Alleged Prosecutorial Misconduct

      Petitioner claims the prosecutor engaged in misconduct during his closing argument.  Doc. #1 at 9.  Specifically, Petitioner claims that the prosecutor improperly:  (1) offered his personal opinions based on facts outside the record that were intended to engender sympathy for the victims and animosity towards Petitioner; and (2) appealed to the jurors' passion and prejudice by telling them not to let Petitioner "get away" with the alleged molestations as he had before in 1993.  Doc. #1-3 at 19–28.

      Respondent again argues that the Court need not reach the merits of Petitioner's prosecutorial misconduct claim because, as the California Court of Appeal found, it was not preserved at trial due to trial counsel's failure to object and/or failure to object in a timely manner.  Doc. #9-1 at 29–31; Doc. #10, Ex. 12 at 35–36.  The Court agrees.

      The California Court of Appeal set forth the relevant parts of the prosecutor's closing argument about which Petitioner complains, and noted trial counsel failed to object at the time the comments were made.  Doc. #10, Ex. 12 at 33–35.  The court explained that it was only after the jury was excused following the prosecutor's rebuttal argument that trial counsel objected and requested a jury admonition.  Id. at 35.  The court then noted the trial court's response to the defense objection:

> "My concern is that the objection is now untimely,
> and [defense] counsel's been pretty assertive and

29

aggressive on other occasions and I regret the
courtesy that was extended to the [c]ourt[14]
prevented [counsel] from entering that objection, but
it is now untimely based on the status of the case."

Id.

As explained earlier, this Court is precluded from reviewing questions of

federal law decided by a state court if the decision rests on an adequate and

independent state law ground.  Coleman, 501 U.S. at 729–30.  The Ninth Circuit

has held that a federal court cannot review a claim of prosecutorial misconduct if

the petitioner has procedurally defaulted the claim by failing to make a

contemporaneous objection in the trial court.  See Jackson v. Giurbino, 364 F.3d

1002, 1006–07 (9th Cir. 2004).  Because this is precisely what happened here,

and because Petitioner has not attempted to show cause and prejudice or that

failure to consider his prosecutorial misconduct claim will result in a fundamental

miscarriage of justice, this Court is barred from considering Petitioner's claim.

Coleman, 501 U.S. at 750.

### 5.    Alleged Ineffective Assistance of Counsel

The Sixth Amendment guarantees the right to effective assistance of

counsel.  Strickland v. Washington, 466 U.S. 668, 686 (1984).  To prevail on a

claim of ineffective assistance of counsel, Petitioner must show that counsel's

performance was deficient and that the deficient performance prejudiced the

defense.  Id. at 688.

To prove deficient performance, Petitioner must demonstrate that

counsel's representation fell below an objective standard of reasonableness under

_____

[14] Trial counsel explained his failure to object at the time of the
prosecutor's comments was because he "didn't want to interrupt the [c]ourt."
Doc. #10, Ex. 12 at 35.

30

prevailing professional norms.  <u>Strickland</u>, 466 U.S. at 688.  To prove counsel's performance was prejudicial, Petitioner must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  <u>Id.</u> at 694.

Petitioner claims trial counsel was ineffective for a variety of reasons.  Doc. #1 at 9.  Each alleged instance is analyzed in turn below.

A.      Alleged Ineffectiveness Related to Dr. Okla

Petitioner claims trial counsel was ineffective for failing to retain Dr. Okla in a timely manner, failing to prepare her for the Evidence Code section 402 hearing, and failing to ask her proper questions that would have elicited responses demonstrating the relevance of her testimony to Petitioner's case.  In rejecting Petitioner's claim, the California Court of Appeal produced a lengthy analysis explaining that even if counsel rendered deficient performance with respect to Dr. Okla, Petitioner suffered no prejudice as a result.  <u>See</u> Doc. #10, Ex. 12 at 27–31.  The court explained why any alleged error with respect to counsel's performance was harmless as follows:  (1) counsel's "brief synopsis [of the substance of Dr. Okla's proffered testimony] actually gave more specific information regarding the relevance of Dr. Okla's expertise to the facts of this case than she ever offered during her testimony; (2) "the record reflects that [trial] counsel went over [Dr. Okla's] experience and training in sufficient detail to apprise the court of the extent of her expertise; and (3) "[a]s to [Petitioner's] claim that counsel failed to ask proper questions that would demonstrate the relevance of Dr. Okla's testimony to this case, any failure on counsel's part to ask questions that would elicit such testimony was remedied by the repeated questions of both the prosecutor and the trial court, as they attempted to glean the

relevance of Dr. Okla's testimony regarding suggestibility to what had in fact occurred here."  Doc. #10, Ex. 12 at 29.

For the reasons the Court noted earlier in rejecting Petitioner's claim that the trial court violated his right to present a defense by refusing to allow Dr. Okla to testify, it cannot be said that counsel was deficient or that there is a reasonable probability that, but for counsel's alleged error in retaining, preparing or questioning Dr. Okla the outcome of Petitioner's trial would have been different. Strickland, 466 U.S. at 694.  The Court finds that the California Court of Appeal's prejudice analysis under Strickland and resulting rejection of Petitioner's ineffective assistance of counsel claim as it relates to Dr. Okla was neither contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent, nor was it based on an unreasonable determination of the facts.  See 28 U.S.C. § 2254(d); Strickland, 466 U.S. at 694. Accordingly, Petitioner's claim on this particular ground is DENIED.

B.   Alleged Ineffectiveness for Failing to Object to Alleged Prosecutorial Misconduct

Petitioner claims trial counsel was ineffective for failing to lodge a timely objection and request an admonition regarding alleged instances of prosecutorial misconduct.  Without deciding whether or not trial counsel's performance was deficient, the California Court of Appeal instead simply found that Petitioner suffered no prejudice.  Doc. #10, Ex. 12 at 37.  The court explained:

> First, as stated, the misconduct, if any, was certainly not egregious.  With respect to the prosecutor's comments about the effects of the abuse on Carmen and Maria, the prosecutor was, at least in part, drawing inferences from the evidence, asking the jurors to use their common sense and what they knew about children to understand the way in which Carmen and Maria's lives were irreparably harmed by the circumstances described in their testimony.  As to the comment that molesters are selective about

their victims, this inference was not unwarranted in light of the evidence regarding Carmen, Maria, and J.'s shyness, and it would be reasonable for [Petitioner] to believe that, since neither Carmen nor Maria reported him, Maria's daughters would also be safe targets.  Moreover, it arguably is common sense to presume that child molesters would be more likely to prey on the weak and vulnerable.  This certainly was not such an outlandish or unfair statement as to improperly engender antagonism toward [Petitioner.].

Also, with respect to the prosecutor's telling the jury not to let [Petitioner] get away with the sexual abuse again as he had in 1993, while perhaps slightly more provocative than the other complained-of comments, these remarks were not inflammatory and did not amount to a request for the jury to convict [Petitioner] based on his past acts, which only had to be proved by a preponderance of the evidence.  Just before urging the jury in his closing argument not to let [Petitioner] get away with it again, the prosecutor said, "[a]nd Carmen and Maria didn't want to come forward.  Fine.  He's not charged with that, but J. and R. had no choice when they walked into that house.  They were little girls, and thank goodness they came forward within eight months. . . ."  Thus, in context, the prosecutor was observing that, this time, the molestations had not been ignored and asking that justice finally be done, while making clear that the only charges at issue were those relating to J. and R.

Second, the trial court instructed the jury that "[s]tatements made by the attorneys during trial are not evidence" and "[y]ou must decide all questions of fact in this case from the evidence received in this trial and not from any other source."  (CALJIC Nos. 1.02, 1.03.)  The court also instructed the jury that it had to find [Petitioner] guilty of the charges against him beyond a reasonable doubt.  (CALJIC No. 2.90.)  The court further instructed that, even if the jury found by a preponderance of the evidence that [Petitioner] had committed prior sexual offenses, "you are, nevertheless, cautioned and reminded that before [Petitioner] can be found guilty of any crime charged or any included crime in this trial, the evidence, as a whole, must persuade you beyond a reasonable doubt that [Petitioner] is guilty of that crime."  (CALJIC No. 2.50.01; see also CALJIC No. 2.50.1.)

Defense counsel also reminded the jury of the

33

reasonable doubt requirement and told them that neither his nor the prosecutor's arguments constituted evidence, specifically stating: "What [the prosecutor] says to you is not evidence, and, you know, he did some testifying here this morning about how kids normally are and so forth and so on. You know, some stuff is common knowledge, reasonable inferences can be raised, but some of the stuff he's talking about is beyond the evidence. You should ignore that, because the other instruction the judge is going to read you is you have to decide the evidence offered you from the witness stand, and you can't speculate."

Finally, the evidence of guilt in this case was extremely strong. J. and R. provided consistent statements and testimony (particularly in light of their youth) regarding what [Petitioner] had done to them. Furthermore, the evidence of [Petitioner's] prior sexual abuse of Carmen and Maria was strikingly similar to the evidence regarding what he had done to R. and, especially, to J. [Citation.] In addition, [Petitioner] acknowledged offering $5,000 to Carmen after she confronted him about his molestation of her granddaughters.

For all of these reasons, we conclude that it is not reasonably probable that the outcome in this case would have been different had defense counsel timely objected to the prosecutor's comments and requested that the jury be admonished. (See <u>Strickland v. Washington</u>, <u>supra</u>, 466 U.S. at pp. 694, 697.)[15]

Doc. #10, Ex. 12 at 37–39.

In evaluating whether a prosecutor engaged in misconduct , "[t]he relevant

_____

[15] "In his habeas petition, [Petitioner] also argues that counsel was ineffective for failing to object to the alleged misconduct and to request that an admonition be given. He includes a declaration from trial counsel, in which counsel stated that he objected late to the comment that the jury should not let [Petitioner] get away with it again because he did not want to interrupt the court or counsel and did not want to draw undue attention to his objection or the basis therefor. He did not object to the comments regarding Carmen and Maria never being whole as a result of the sexual abuse because he did not at the time recognize those comments as misconduct. Defense counsel's statements in his declaration do not affect our conclusion regarding appellant's claim of ineffective assistance of counsel."

34

1    question is whether the prosecutor[']s[] comments 'so infected the trial with

2    unfairness as to make the resulting conviction a denial of due process.'"   Darden

3    v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo,

4    416 U.S. 637, 643 (1974).  The "appropriate standard of review for such a claim

5    on writ of habeas corpus is 'the narrow one of due process, and not the broad

6    exercise of supervisory power.'"   Darden, 477 U.S. at 181 (quoting Donnelly,

7    416 U.S. at 642).  As the Ninth Circuit noted, "Darden measured the fairness of

8    the petitioner's trial by considering, inter alia, (1) whether the prosecutor's

9    comments manipulated or misstated the evidence; (2) whether the trial court gave

10   a curative instruction; and (3) the weight of the evidence against the accused.

11   Tan v. Runnels, 413 F.3d 1101, 1115 (9th Cir. 2005) (citing Darden, 477 U.S. at

12   181–82).

13        Here, as the California Court of Appeal noted:  (1) the prosecutor's

14   comments regarding Petitioner's conduct were a fair comment on the evidence;

15   (2) the trial court gave several curative instructions that comments by counsel

16   were not to be considered as evidence – which trial counsel reminded the jury of

17   during his closing argument – and (3) the evidence against Petitioner was

18   "extremely strong."  Under these circumstances, the Court finds that the

19   California Court of Appeal's prejudice analysis under Strickland and resulting

20   rejection of Petitioner's ineffective assistance of counsel claim as it relates to

21   failure to object to any alleged prosecutorial misconduct was neither contrary to,

22   or involved an unreasonable application of, clearly established Supreme Court

23   precedent, nor was it based on an unreasonable determination of the facts.  See 28

24   U.S.C. § 2254(d); Strickland, 466 U.S. at 688 & 694; Darden, 477 U.S. at 181;

25   Tan, 413 F.3d at  1115.  Accordingly, Petitioner's claim on this particular ground

26   is DENIED.

27

28                                        35

C. <u>Alleged Ineffectiveness for Failing to Investigate Regarding Money Petitioner's Family Gave to Carmen</u>

The California Court of Appeal provided the following background and analysis regarding this particular claim:

> In his petition for writ of habeas corpus, [Petitioner] contends defense counsel was ineffective for failing to investigate information regarding [Petitioner's] family having provided Carmen with money, at Carmen's request. . . .
>
> During trial, [Petitioner] acknowledged offering Carmen $5,000 after she confronted him about the sexual abuse, but claimed that the reason he offered it was because "she was having financial problems, and I thought maybe her whole scheme, because I thought that she was scheming, it was because she needed money, she wanted money, so I asked-I told her I just requested $5,000 from my 401-k.  We can take care of the situation.  Otherwise, this can go into a very messy, expensive situation."
>
> During closing argument, the prosecutor argued that [Petitioner's] offer to give Carmen $5,000 was evidence of consciousness of guilt, and said: "There's no testimony from anybody that somehow she is struggling and needs money. . . .  Money has never been an issue for her."  During rebuttal, counsel further asked the jury to consider what motive Carmen and her family could have to falsely accuse [Petitioner] of molesting them, opining that money was not the motive as [Petitioner] had never given them money before.
>
> In a declaration attached to the habeas petition, Esperanza stated that Carmen repeatedly asked her for money over the years, that she regularly gave Carmen money, and that [Petitioner] knew that she was giving Carmen money.  In addition, Carmen had asked Esperanza to cosign on a home loan, but Esperanza refused.  Esperanza also stated that neither defense counsel nor his investigator asked her about this information, even though she and her daughter, Sylvia, had told them about Carmen's many requests for money.  In another declaration, [Petitioner] stated that he was aware that Carmen frequently asked Esperanza for money and Esperanza gave it to her, and that Esperanza refused to cosign on a loan.

36

In an additional declaration, [Petitioner's] daughter, Sylvia Frates, stated that defense counsel had told her to relay investigation requests directly to his investigator, which she did. She told the investigator that she wanted him to look into the fact that her parents frequently gave Carmen money, at Carmen's request, and that Esperanza had refused Carmen's request to guarantee a home loan. Frates also prepared a notebook containing information she thought would be useful to the investigator. On October 3, 2005, she gave him the notebook, a page of which stated in relevant part: "Because Carmen was at Ralph and Esperanza's practically every day, Ralph and Esperanza always expected Carmen to ask for money[,] $20.00 for gas, for lunch, for a bill, to co-sign for a house (early 2004), to pay for a utility bill for [Maria] Christina. . . . Carmen also asked Esperanza to pay for Alberto's car to get [it] out of the impound."

Also attached to the habeas petition are declarations by defense counsel and his investigator. In his declaration, defense counsel stated that he did not recall being told that [Petitioner's] family had frequently given money to Carmen in the past because she had financial problems. He had asked [Petitioner's] daughter, Sylvia Frates, to relay any information to his investigator. The defense investigator stated, in his declaration, that Sylvia Frates passed along requests for investigation during the case. He had no memory of Frates asking him to look into the subject of financial assistance provided over the years by [Petitioner's] family to Carmen. He did recall being told that, at some point, Carmen asked Esperanza to cosign a loan, but that Esperanza refused. He did not look further into this information.

According to appellant, the fact that Esperanza had refused to be a cosigner on Carmen's loan gave Carmen a motive to falsely accuse appellant of molestation, and the fact that Esperanza had frequently given Carmen money in the past "provided the jury with an alternative, innocent explanation for his $5,000 offer to her after the accusations surfaced." Appellant asserts that, had this evidence been presented, it would have neutralized the prosecutor's claim that the offer of money was evidence of appellant's consciousness of guilt.

Even assuming defense counsel and/or the defense investigator were in fact informed of Carmen's requests for money, we need not decide

whether counsel's representation was deficient due to his failure to investigate this issue because [Petitioner] was not prejudiced by any such deficiency.  (See <u>Strickland v. Washington</u>, <u>supra</u>, 466 U.S. at pp. 694, 697.)

The evidence that [Petitioner] offered Carmen $5,000 was just one piece of evidence in a very strong case against [Petitioner].  As previously discussed, J. and R.'s descriptions of the sexual abuse in reports to family, interviews, and testimony were, in general, quite consistent.  Moreover, Carmen and Maria's testimony regarding [Petitioner's] extremely similar prior sexual abuse of them further strengthened the case against [him].  In addition, the prosecutor's assertions during argument that Carmen had never asked [Petitioner] for money were tempered by the trial court's instructions that counsels' arguments were not evidence and that the jury was the sole judge regarding whether any statement by [Petitioner] constituted an admission. (CALJIC Nos. 1.02, 2.71.)  Finally, [Petitioner] testified that the reason he had offered Carmen the money was because she was having financial problems and he thought she needed money and was scheming.[16]

Accordingly, we find that it is not reasonably probable that the outcome in this case would have been different had counsel investigated Carmen's previous requests for money.  (See <u>Strickland v. Washington</u>, <u>supra</u>, 466 U.S. at pp. 694, 697.)

Doc. #10, Ex. 12 at 39–42.

Again, the Court finds that the California Court of Appeal's prejudice

analysis under <u>Strickland</u> and resulting rejection of Petitioner's ineffective

---

[16] "We also observe that [Petitioner] himself, in arguing the prejudicial impact of the prior sexual offense evidence in his opening brief, attempts to discount the import of this evidence regarding the $5,000.  He states, 'the prosecution's argument that [Petitioner's] offer to Carmen of $5000 to "make it better" established his consciousness of guilt lost its force in the face of [Petitioner's] testimony that he had arranged for the withdrawal of the money from his retirement plan before Carmen confronted him and that he offered it to her because he thought she was scheming to get money and he felt the offer might save him from a more expensive financial problem later.'"

38

assistance of counsel claim as it relates to failure to investigate regarding money Petitioner's family allegedly gave to Carmen was neither contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent, nor was it based on an unreasonable determination of the facts.  <u>See</u> 28 U.S.C. § 2254(d); <u>Strickland</u>, 466 U.S. at 688 & 694.  Given the weight of the evidence against Petitioner, it is difficult, if not impossible, to see how the result of the proceedings against Petitioner would have been any different had counsel investigated information that Petitioner's family had provided Carmen money at her request.  Accordingly, Petitioner's claim on this particular ground is DENIED.

## CONCLUSION

After a careful review of the record and pertinent law, the Court concludes that Petition for a Writ of Habeas Corpus must be DENIED.

Further, a Certificate of Appealability is DENIED.  <u>See</u> Rule 11(a) of the Rules Governing Section 2254 Cases (effective Dec. 1, 2009).  Petitioner has not made "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  Nor has Petitioner demonstrated that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000).  Petitioner may not appeal the denial of a Certificate of Appealability in this Court but may seek a certificate from the Court of Appeals under Rule 22 of the Federal Rules of Appellate Procedure.  <u>See</u> Rule 11(a) of the Rules Governing Section 2254 Cases (effective Dec. 1, 2009).

//

//

1        The clerk shall terminate any pending motions as moot, enter judgment in

2    favor of Respondent and close the file.

3

4        SO ORDERED.

5

DATED:   July 06, 2010

6                                              CHARLES R. BREYER
                                               United States District Judge
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26    G:\PRO-SE\CRB\HC.08\Olmedo-08-4467-deny petition.wpd

27

28                                              40